*33 OPINION.
Marquette:
The question here involved is one of fact, namely, whether certain disbursements made by the petitioner were payments of royalties, or whether they were distributions of dividends. The petitioner contends that they were royalties and were reasonable in amount, while the respondent takes the position that they were dividends in the guise of royalties.
Section 234 (a) (1) of the Revenue Acts of 1918 and 1921, reads as follows:
Sec. 234 (a) That in computing the net income of a corporation subject to tax imposed by section 230 there shall be allowed as deductions:
(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually ren *34 dered, and including rentals or other payments required to be made as a condition to the continued use or possession of property to which the corporation has not taken or is not taking title, or in which it has no equity.
Under this section royalty payments made in consideration of a right granted to use another’s patented article or process of manufacture are undoubtedly to be classed as ordinary and necessary expenses of the business and, therefore, deductible.
A royalty is defined by Bouvier as “A payment reserved by the grantor of a patent, mining lease, etc., and payable proportionately to the use made of such right.” And in 34 Cyc. 1817, we find the statement that: “A royalty is a tax or duty paid to the owner of a patent for the privilege of manufacturing or using the patented article; something proportionate to the use of a patented article, in other words, a kind of excise,” and citing W. U. Tel. Co. v. Bell Tel. Co., 125 Fed. 342, 348.
The test, then, is whether the payment made was based upon, and proportionate to, the use of another’s article or process of manufacture.
Do the facts show that the payments here in question measure up to that test? In our opinion, they do not. The original contracts for payment of royalties at the rate of 6 cents for each Smith type and Sindelar type guard which the petitioner might manufacture, were annulled a few weeks later by agreements which left to petitioner’s board of directors the full power to fix, at the end of each year, the royalty rate to be paid for that year. The net profits each year were ascertained without taking any account of royalties, and it is patent from the evidence that the so-called royalties were fixed each year with reference to the year’s profits, rather than proportioned to the use made of the manufacturing rights granted by Smith and Sindelar. This is borne out by the evidence which shows that the so-called royalties, as fixed each year, always exhausted (or nearly exhausted) the profits for that year; that in computing the aggregate amount to be so paid there were included types of guard which the petitioner was free to make without any royalty payment; that there was no allocation of these so-called royalties to Smith and Sindelar, but all the stockholders of the petitioner participated in the benefits of these payments, in proportion to their stockholdings at an agreed ratio; that this ratio was exactly the same as that at which dividends were to be distributed; that little, if any, profits were distributed as dividends; that the right to participate in these distributions depended upon one’s ownership of stock and not upon his ownership of a patented article or a special process for manufacturing.
From the evidence before us, it would severely tax one’s credulity to believe that th.e petitioner was obliged to pay Smith or Sindelar *35 any sum at all, as royalties, for tbe right to manufacture their respective types of guards. Doubtless these gentlemen did, at the beginning, insist upon the royalty agreement of 6 cents per guard. But before the petitioner got its business well started, they waived their rights as to such royalties. A glance at the following table will show that these two men were not particularly insistent upon “ royalties ” for the use of their articles and processes of manufacture :
[[Image here]]
The evidence also discloses that the petitioner manufactured in 1922 a total of 897,706 guards. The aggregate amount of royalties at the rate of 5.7 cents as fixed by petitioner’s directors, would be $51,169.24. But the resolution of the directors directed the distribution of “ royalties ” on 977,229 guards, in the aggregate amount of $55,973.03. In other words, the petitioner would have us believe that it paid “royalties” amounting to. $4,803.79 on 76,523 guards which it did not manufacture and on which, therefore, no royalty could possibly be due.
Again, in 1923, the petitioner manufactured a total of 1,070,807 guards. The directors fixed the “ royalty ” rate at 2⅜ cents per guard, and the aggregate amount of so-called royalty would be $22,754.65. But the directors’ resolution called for a payment of 2⅛ cents “ on 125,194 guards, or $24,000.” On that number of guards, at the rate specified, the total amount would be only $2,660.37.
Again, in 1921, the total number of guards manufactured by the petitioner was 244,933, on which the aggregate “ royalties ” at the *36 2 cent rate fixed by the directors would amount to $4,898.66. Yet the directors, for some unknown reason, omitted 26,413 guards of the Sindelar type from their computation, and distributed only $4,370.40 on 218,520 guards.
These facts have but little probative value in support of the petitioner’s claim. The burden rested upon the petitioner to prove that the respondent’s determination of deficiencies was erroneous, and that it should be set aside. In our opinion, the petitioner has failed to sustain that burden, and the determination of the respondent is, therefore, approved.

Judgment will he entered for the respondent.